# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

TERRI LEE MEYER

VS.        Plaintiff

The DEPARTMENT
OF Corrections
Paul Howard et.
al.

Defendent

06 - - 117

CiVil ACTION NO:

```
F I L E D
FEB 2 3 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
```

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

Terri LEE MEYER
    Plaintiff

        VS.

DELAWARE DEPT. OF
CORRECTIONS, Stanely
Taylor in his individual
Capacity and official
Capacity as D.o.C.
Commissioner: Paul
Howard in his Individ-
ual and official
Capacity as
Chief OF D.o.C.: Patrick
Ryan in his individual
Capacity and official
Capacity as warden of
BWCI: George O'Conner
in his individual and
official Capacity as the
Law Library: WCI Super-
visor: Colleen Shotzberg-
er in her individual
and official Capacity
as Treatment Services
Administrator: Cpt. Repetti
in his individual and
official Capacity as a
Captain at BW.CI., Shift Com.
Correctional Medical
Services, Dr. Hooper
in his individual and official
Capacity as administrator
oF CMS. Dr Jacovb in
his individual and official

Civil action no. _____

Jury Trial Demanded

# I. Jurisdiction

1. This Court has jurisdiction over plaintiff's claim pursuant to U.S.C. §§ 1331 and 1343(a)(3).

# II. Venue

2. The District of Delaware is an appropriate Venue under 28 U.S.C. § 1391(h)(2) because a substantial part of the events, ommisions, and deprivations giving rise to the Claims occured in this district.

# III. Parties

3. Parties listed on page 1, Stanely Taylor, Paul Howard, and Patrick Ryan, are responsible For operations and conditions at the D.J.B. Women's Correctional Institution, and are involved in policy and decision Making. They are sued in thier individual and official Capacity.

Colleen Shotzberger is responsible For overseeing the Classification board at W.C.I. She is involved in Policy and decision Making. She is being sued in her individual

and official Capacity; George O'Conner is responsible for seeing the functions of the B.W.C.I Law Library, he is supervised by Colleen Shotzberger and Warden Ryan he is sued in his individual and official Capacity; Cpt. Repetti is a Captain at B.W.C.I he is sued in his individual and official capacity; Dr. Jacovb (psych.) is contracted through CMS and his administrator Dr. Hooper, in their individual and official Capacity. Correctional Medical Services is a medical agency Contracted by B.W.C.I and is responsible for the medical needs of the inmates - they are sue At all times relevent to the events des-cribed herein, all of the defendents have acted under color of State law.

Terri Lee Meyer has been an inmate at BWCI since 3-15-97 she is the plaintiff.

## Factual Allegations

Inmate Terri Lee Meyer has been and is facing a substantial risk of serious harm.

Approx. 4 yrs. ago plaintiff was placed in the Law Library in the position of Law Library Clerk, and worked with-out any write-ups or incidents (other than hurting her back) This position is reserved for inmates who have earned the trust of administration. In June 06 Mackinnon Young, the supervisor at the time, transferred to O.C.C. The Plaintiff worked with Ms. DEBBIE Van-diver, the B.W.C.I Activities Coordinator Temporarily while the administration looked for someone to fill the position.

-3-

The plaintiff developed an excellent working relationship with her, and worked without write-ups or incident. Sometime in July 06 George O'Conner transferred from Probation and parole into the position.

Sometime in May 05, 7 other inmates and the plaintiff began drafting a U.S.C. 1983 Civil rights suit against the defendents as well as a few other W.C.I. employees, to address numerous constitutional violations against the inmates under the 1st, 4th, 5th, 8th, and 14th, amendments of the United States Constitution. The plaintiffs intended to ask the courts permission to certify it under class action, with Plaintiff Meyer the class representative. This was a <u>nonfrivilous</u> suit and addressed issues such as inmates housed in closets, and multi purpose rooms, and locked in for hours at a time without access to water or toilet facilities. They had a statement from a chronically ill patient who was forced to defecate in a trash can with 2 inmates standing in front of her with a small towel. Approx. 10 other inmates witnessed the incident. This was just one of many violations. Some of the violations were of a sexual nature, and retaliation for practicing 1st Amendment rights. It is very likely that the administration do not want these violations brought to the attention of the public and the courts.

When George O'Conner took over the BWCI Law Library Plaintiff started to notice → next page

-4-

"Strange" things happening. For example,
a book that she was not permitted to have
mysteriously appeared on her book shelves.
Numerous incident' of this nature occured.
Mr. O'Conner became verbally and mentally
abusive toward the plaintiff, and made
false allegations against her. He baited
the plaintiff by attempting to make her
angry. For example, the Plaintiff had *2
plants in the Law Library. Mr. O'Conner
used a pair of scissors to cut them
up; In addition He made arbitrary rules for the
plaintiff to follow. He made her
leave early, and then complained when
she became behind in her work.
His treatment of the inmates was dep-
lorable, and amounted to denial of access
to the courts, and cruel and unusual
punishment. Inmates who needed to
research cases were not permitted en-
ough time to do so. O'Conner was in
charge of allowing inmates to call their
attorneys, and notorize documents. How-
ever he made them wait—sometimes for
hours while he was on the internet or
the phone. When the Plaintiff informed
him that inmates were waiting he became
irrate with her. Every time (without exception)
he called 10 or 15 inmates to the Law Library
he left. before they showed, leav-
In the Plaintiff alone to help them.
Frequently the inmates became

angry or agitated with the Plaintiff because he wasn't there. Plaintiff was left alone without access to a phone or officer. Had a fight or other Emergency Occured Plaintiff would have been helpless to do anything. The defendents were deliberatly indifferent. They did not respond reasonably when Plaintiff made them aware of the Situation. In Farmer 511 U.S. at 845 and Smith vs Arkansas Dept of Corrections 103 53rd 637 644 (8th Cir 1996). The Supreme Court has made clear that an inmate seeking a remedy for unsafe conditions does not have to await a tragic event before obtaining relief. The Plaintiff is not working in the Law Library at this time, but may be in the future if the court grants her injunctive relief. The plaintiff realizes that Prisons can use a variety of methods to enable prisoners to file Criminal petitions and Civil rights lawsuits. The Court in LEWIS vs Casey 518 U.S. 343 355 (1996) said the right of access to the courts requires officials to enable prisoners "to discover grievances and to litigate effectively once in court" as opposed to filing claims the prisoner already knows about. In addition on the orders of Shotzberger (he says) took (he-O'conner) the grievance Manual and the policy Manual. In a past court order, the court held that inmates are pe mmited to review any section that      applies to them (can't remember case but will add to amended law suit) Inmates wanted to review these,

and many became hostile toward the plaintiff when she attempted to explain to them why they couldn't. The Plaintiff had to be careful what she said to them, or face retaliation. In addition O'Conner told the plaintiff to "not help the inmates so much."

O'Connor made the plaintiff's job almost impossible to do. The plaintiff was in fear everyday, which resulted in anxiety that precipitated Gastrointestional problems and severe headaches (worse than usual). The defendents knew that the Plaintiff was taking medication for depression, and that working under these conditions could cause her to relapse. It is well known that theres a connection between body and mind. The Plaintiff suffered physical injury because of the defendent's actions. Stress effects most every part of the body. Research has shown that stress effects the immune system leaving a host vulnable to a variety of physical disorders. The plaintiff was going to work every day (5 days a week) ill, and in discomfort.

Plaintiff attempted to work with O'Conner but she was not permitted to do her Job. Instead, she was consistenty accused by the defendents of breaking rules (Even though the inmates are not provided with rules). Some of the accusations were so ridiculous the Plaintiff was surprised that they were made by professionals. Plantiff tried to work through the problems, but the defendents made it

* From the defendents.

impossible to do so. O'Conner informed the plaintiff that he did not have compassion for imates - which standing alone is acceptable, but he allowed it to effect his Job and his state of mind, constituting deliberate indifference. toward the Plaintiss. Over time these conditions caused plaintiff to have migraine headaches on a daily basis, heart palpitations, insomnia, anxiety and increased depression, because she dreaded going to work. Most relevent though the Plaintiff was forced under the threat of termination to perform heavy Janitorial duties that was not allowed under a medical order. She provided a memo from the doctor, but it was intentionally ignored, showing the defendents state of mind constituting deliberate indifference to the plaintiff's mental health, and medical needs. I requested O'Conner speak with Shotzberger on several occassions, and ask her to provide the Law Library with a janitor; Shotzberger refused saying she wanted the Plaintiff to make it part of her duties. However, every other section of the institution with clerks (inmate) had a janitor, and this includes Shotzberger's clerk, and the Law Library is the largest area. In Farmer v. Brennen 511 U.S. 825 (1994) the Supreme Court explained what deliberate indifference is in its 1994 decision - when he/she knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. O'Conner and Shotzberger Knew the plain-

tiff had a medical illness ——. they were provided with a copy of the memo and they disregarded both by forcing <sup>her</sup> to act as a Janitor, Even though she was hired as a Law Clerk, and physically unable to work as a Janitor.

On 1-24-06 at approx. 9:00 AM Warden Ryan was informed by C/O Mast (unit officer) that the plaintiff's room had been left "messy." It is not procedure to call the warden over a messy room. Mast called the Law Library and told the plaintiff to return to the unit. When she returned the warden was there, <sup>and Capt. Repetti</sup> He yelled at the plaintiff (while in an outrage) that if * She couldn't keep her room straightened up, he would move her off the honor Pod. The plaintiff had around 12 plants sitting in the corner next to the window. When plaintiff moved to unit #3 many of the inmates were growing potted plants, and plaintiff was informed by the officers that it was okay. Plaintiff had been growing her plants for over 4 years. Practically Everyone (staff) in the institution, including the warden saw them. Some of the staff asked for cuttings and the Plaintiff started hers with <sup>cutting</sup> that were given to her by staff. Everyone was aware of the plaintiffs attatchment to the plants, and that she was proud of them, and spent hours taking care of them. The warden screamed at the plaintiff "who authorized you to have the plants?" When the plaintiff tried to answer him, he told her to "stop arguing with him". Then, the warden ordered the officers to destroy "those weeds" * and Capt. Repetti was in concert with him
we had until 10:00 am to clean!

Her plants were hauled away on a cart and Plaintiff never saw them again. She was emotionally devestated, but did not disrespect the warden in any form. This cruel act toward the plaintiff constitutes deliberate indifference and though the plants would not fall under a "basic need" they had become an important part of the Plaintiffs life. This act violated Plaintiffs rights under the first omendment because it was in retaliation for putting together a law suit. It was also intended to "scare" the defendent into not following through. This awful act also violated the Plaintiff's rights under the 8th amendment - Cruel and unusual punishment. Warden Ryan and Cpt. Repetti knew that this act would devestate the Plaintiff, but they did it anyway. The defend-dents knew that the best way to hurt her was to destroy her plants. It was, as devestating to her if they had destroyed a beloved pet. On 1-18-06 The Plaintiff was called from

Work to the treatment services office by Counselor Nick (unknown last name). When she arrived Jack Stein from D.O.C. Internal Affairs was seated in Nick's office. Mr. Stein had a hand written printed letter. He held it out and said "you wrote this". He claimed he was a hand writing expert and could tell it was her writing. She knew nothing about the letter, and told him so. He continued to accuse her, and a meeting, became an interogation. Finally, She asked to see the letter. The hand-writing did not even resemble hers. Then she read the letter and it contained an accusation of inappropriate behavior between a teacher and an inmate (who was her friend) of mine)

* particulary numbers, but they no

She once again told Mr. Stein it was not her
letter, and she would never write an anonymous
letter because if she had something to say she does
not have a problem saying it. In addition, she
told him that she works in the same area and
never saw at any time innappropiates. She behavior
had an idea who may have written the letter,
so she gave them the name. He seemed satisfied
and dismissed her. Later she was told by a admin. staff
that warden Ryan was "convinced she wrote it and was angry".
DeSalvo (Therapist) had a meeting with Shotzberger
to address these "problems". She asked her why
her name was given to Internal Affairs. She
claimed that all of the inmate educ. workers
were interviewed. This was not true. The
best to her knowledge only 2 inmates were
interviewed-          and the name given to
them. Shotzberger also told      (1) My Job was
not in jeopardy (2) Almost everything she hears
about me is good. (3) I would never be moved
(4) I'm a role model inmate. My Counselor (DeSalvo)
heard the conversation in its entirety. Many
out of these things were happening to     and knew
        in trouble this is a common practice
at B.W.C.I.    managed to walk a straight line
which was stressful in itself. could not figure
out who was harrassing me and why and soon
began thinking "was paranoid". told my coun-
selor. It turns out that all of the things
I was suspisious about, were truely happening.
B.W.C.I. breeds paranoia because the inmates
do not have rights. At anytime something
may take place that blatently and cruely violates
them. My Job in the Law Library was fine

-11-

Until she began teaching the inmates their rights under the Delaware Constitution and U.S. Constitution and what to do when they're violated. I stressed exhausting administrative remedies; but the the inmates here are not permitted to "Complain." I made suggestions to them on how they might fill that requirement under the P.L.R.A. Inmates at B.W.C.I. are retaliated against for filing claims. If the threats of retaliation were removed the inmates will come forward.* Warden Ryan "punishes those who "Complain."

On 1-25-06 the plaintiff was logged out of unit 3 to go to work. O'Conner was already there, locked in his office, and talking on the phone. At approx. 8:50 AM O'Conner came out of his office and told the plaintiff that he had an emergency and she should return to her unit. It was a few minutes or so. before 10:00 AM code red "no movement." By the time the Plaintiff shut down her computer, and put books on the shelf She was caught in count. O'Connor was leaving So the Plaintiff asked him if she could wait in the Computer Lab as opposed to the hallway.
*Plaintiff had permission from the teacher Amy Haywood. floor. He approved the request. When code cleared at 10:30 AM, Plaintiff immediately went straight back to her unit. She was logged out of unit 3 at 8:30 the next morning. On 1-26-06, O'Conner and plaintiff arrived at the Law Library enterance at the same time — approximately 8:45 am they entered and right away before he had a chance to see it, he asked why the Plaintiff's Computer was on. She said that she thought that she had shut it down the day before, but perhaps because she was in a hurry to get out of the building before code red she had not completely

-12-

*She would also come forward.

Shut it down. No one was logged on. O'conner asked the plaintiff if she had returned to the Law Library the day before after he had told her to go back to her unit. She told him that would have been impossible because the door was locked. Then he said — "maybe an officer had let her in. She responded that no officer would have done that without authorization. In addition, plaintiff asked him to call her unit-3 and check the in/out times. He didn't call so she thought the issue was moot. Approx. 1 hour later O'Conner left, and stayed gone approximately one half hour. When he returned he said, that he wanted to know what officer had let her in the Law Library. Once again, the plaintiff told him that She was not in the Law Library after he told her to return to her Unit. He stated, — that's not what the Warden told him, and the Warden (RYAN) knew which officer let her in. Once again, Plaintiff requested that he call Unit 3 to verify in/out times. O'Conner refused. Then he became irrate and said "I'm tired of your bullshit- go back to your unit for the day." When plaintiff returned to Unit-3, She explained to the Unit Officer C/O Greer what had taken place, and asked her to check her times. They were: on 1-25-06 in at 10:35 am, and not out again until the next day 1-26-06 at 8:30 AM. In addition, the plaintiff was called in and out*, and She was veiwed (seen) and video taped by Control. IF Warden Ryan truely believes that the plaintiff was in the Law Library at the times in question, then he should evaluate his Security System (of the institution) because it must have failed on that day. However, he knew she washt there At 3:45 pm, the same day the Plaintiff was

* By radio                                   13.

and when she Was called in it was to see the Psychiatrist Dr Jacovb (psych) HE asked the Plaintiff if she Knew why she was there. When she said no, he told her that the Warden asked him to see her. He then asked her why she had refused the medication, he had ordered for her. about I me before She responded that she had asked only for something for her insomnia, and the medication he gave her was for psychosis. He asked her how she Knew that, and she told him she had looked it up in the *P.D.R. HE seemed angry, and began drilling her about medications. He asked her what type of drug bupropion is and she answered that it's a Serotonin Reuptake inhibitor. He became angrier because she Knew the answer. Then he

asked again why she washt taking the medication, so the Plaintiff attempted to explain to him that she would not take something she did not need* that she was not psychotic. He dismissed her. On the way out she observed him picking up the phone. Plaintiff decided to stop and weigh herself on her way out. She overheard him talking on the phone and heard him say.... that "Meyer's will not take the medication, and that she was "uncooperative." (Plaintiff thinks it was either Ryan or Shot zberg or her way back to Unit 3 Plaintiff stopped at the dining hall to eat, then returned to
*the unit. (3) *1- physicians Desk Reference
-14-
The plantiff asked for Tegretol Temporarily to help her sleep - he refused

approx. 1 half hour later Lt. Kenny came to
her room and said that "they" had her as a pri-✳
ority move to unit 6-the mental health unit.
He stated that he didn't know why. Two officers
(following orders) confiscated most of the plaintiffs
property, and she was left with only the basics.
a list of those items are on a slip enclosed with
this complaint. All of the plaintiffs art work
and writing were confiscated and her law books
as well as other numerous items. plaintiff
was transferred to unit 6 with the plaintiffs
full cooperation and without incident. The next
day on 1-27-06 O'Conner called unit 6 and
left a message with the officer that plaintiff
should return all Law Library property and
he would come to the unit to pick it up. O'Conner
showed up later that day. Plaintiff then
informed him that most of her property had
been confiscated and that she did not have
any of the property with her. However, plaintiff
later was informed she had a class 1 disciplinary
for having law books in her possesion. Plaintiff
has a memo signed by O'Conner that allows her
to have 5 law books at a time - but she was not in possesion
of any. if any did find any books they would have been in
the plaintiffs confiscated possesions. As
to what she had, plaintiff had 2 C.J.S.'son
constitutional law, 1 federal sentencing
guidelines, 1 civil rules and procedures,
and one dictionary. Other than the diction-
ary the books were outdated, and the new
books shelved. Plaintiff was going to throw
them in the trash but decided to look at them

✳ Enclosed in a classification sheet dated the day
after the inmate was removed.         see Back—

Plaintiff was also informed that she was terminated from her job because she was in the Law Library without authorization. When she attempted to defend her position, he said, "The warden said you did it, and thats all the Evidence I need." I was Floored. They said she did this, and that was the End of it. No due process.

before she did. Plaintiff did not take over what her memo permitted, but the defendents are attempting to alter the situation to make it appear that she did. Plaintiff has     not recieved paperwork on this allegation. However if plaintiff does go to the disciplinary officer, he will be one of the chief defendents on the original law suit. It would not help to request another officer, because through experience she knows it would not happen. Plaintiff has been told that she is not allowed to do any leagl work. On 2-10-06 Plaintiff's roommate "snitched" that she was doing legal work. O'conner and Capt. Roberts came to the Plaintiff's room with an officer and "shook it down". They did not find anything. The defendents are so fearful that the plaintiff will file a law suit and expose them that they have shut her computer down (in the law library) and no one is permitted to use it. They fear that the plaintiff will have someone download her legal work and smuggle it, to her, and they know she is a computer oper-ator, and is very good with computers. The prisoners at B.W.C.I are treated like P.O.w.s, with no rights. The warden allows them to be treated poorly and then retaliates when one complains. The violations the plaintiff has endured are being implemented by the defendents to keep her from filing a law suit, that will divulge violations that Warden Ryan woold rather officials, and the public not know about. Warden Ryan has attempted

-16-

* Most of the books are never used by anyone but the plaintiff. Plaintiff loves books and had

to convince others that the plaintiff is "crazy," to justify taking her off her job, and placing her in the Mental Health Unit. Nothing could be further from the truth. The defendents want the plaintiff somewhere she can be "watched" so she can't draft a lawsuit. This type of manipulation is common at B.W.C.I. The warden becomes enraged if an inmate makes a complaint outside of the institution, whether it be a letter, a phone call, or a lawsuit.* The mental torture the defendent has been forced to endure over the past year would shock any rational person. Ryan and Shotzberger go to great lengths to hide the violations at B.W.C.I.

The defendents, particularly Warden Ryan, has stripped the plaintiff of all of her rights and priviledges in a horridic, and deplorable way. The plaintiff is in fear for her safety. Two other inmates Jan White and Sheryl Luft, also plaintiffs in the lawsuit,* and are a threat to the warden because of thier intelligence and willingness to stand up for what's right, were both transfered to Unit 8 - The disciplinary Unit. The plaintiff does not know what took place in their cases but there is a strong liklihood that it's retaliation. She can't talk to them.

In a 1987 Supreme Court decision, Turner vs. Safely the Court held that in order to place a limitation on a civil liberty it must be "reasonably related to penological interests. Four factors are used to apply the "Turner Test" 1- If there is a valid, rational, connection between the deprivation

* on Internal affairs    -17-     * 1- original law suit

and the officials justification for it. 2· IF there is another way for the inmate to exercise the Civil liberty· 3· The effect of exercising the Civil liberty has on prison operations and other inmates 4· Whether there is a different way for officials to achieve their goal that allows the inmate to practice her Civil liberties.

However, the Turner test applies to cases where there needs to be a balance between interests of the officials, and the Constitutional rights of the inmates. In this case the balance leans to the side of the defendents, and the Plaintiff's Civil rights have been illegally and profoundly denied as a way ——— to punish, retaliate, and scare the Plaintiff into not "airing" BWCI's dirty laundry."

No rational person, or trier of the fact could determine that the Plaintiff went from a role model inmate, Law Library Clerk (for 4 years), housed in the "honor" pod, for the past 5 years, and then for no reason she is placed in the mental Health Unit in 3 days* The false accusation that got the ball rolling, was un-Constitutional in itself. Before the violations, the plaintiff was not given notice of any of the deprivations and due process was not even a consideration, as far as the defendents were concerned. Plaintiff and her Counselor met with Shotzberger, and she told them that all was fine and there were no problems. The plaintiff did not have any

* all of the deprivations took place with-

-18-

recent write-up or any disciplinary.
There were no probems other than
the difficulties the plaintiff was
having working with O'Conner.
Warden Ryan and Colleen Shotzberger
decided that the plaintiff was complain-
ing too much, and due to _____ the im-
pending lawsuit, and the letter the
Warden was convinced she wrote*
(although she didn't) made her a "trouble-
maker" who had to be dealt with
immediately and swiftly. The plaintiff
is unsure if the defendents are aware
~knows that~
that inmates have a right to complain
and file lawsuits under the first amend
ment. If the defendents had nothing
to hide, they would not find it
neccesary to try to keep the plaintiff
quiet. If the defendents thought
that taking her job, lawbooks, and
forbidding her to do legal work would
keep the plaintiff from filing a law-
suit, they greatly underestimated
her.

* Had plaintiff written it, she was under the U.S.
Constitution and the defendents would not have
the right to penalize her, therefore, had she written
it she would have said so.

19

## Conclusion

The First amendment prohibits prison official from retaliating against inmates and preventing them from petitioning the Court. Crawford-El v. Britton 523 U.S. 574 1588 no.10 (1998).

What the defendents have done in this case is strip the plaintiff of her most fundamental rights, to cover up their wrong-doings, thus serving their own self-interests. The defendents, with profound deliberate indifference, did not take into consider-ation, what the effects on the plaintiff would be. The plaintiff has studied many cases on the rights of inmates, and can state with assurance, that her own case is the worse she has ever seen re-garding the 1st amendment. What the defendents are doing is henious. To take advantage of the vulnerability of an inmate, who is in their custody, and may have difficulty finding someone to protect her best interests, is not just illegal but is unethical and a horrible example of a prison official: who is paid to protect others. The corruption among the defendents must be exposed to the public and the Courts, and halted.

To abridge the plaintiffs Constitut-ional rights the defendents have-

1. Transferred her from minimum sercurity honor pod (with a single room) to a maximum security Mental Health unit, and housed with

20- * Cont. on next pg.

Supplement to the
Complain "Conclusion"

It's obvious the defendents
orchestrated a close to plausible defence.
The Plaintiff regrets that she did not
have the time or the research material
to draft this complaint. The defendents
reasoning is extremely predictable.
They will more than likely say that
the plaintiff was mentally ill, but she
was not aware of it because of the nature
of the illness. They will say, "she was para-
noid." The plaintiff complained about
the arbitrary actions of others, and
out of the norm and unexplainabe events.
She "thought" that perhaps she was be
coming paranoid because of the negativ
actions of others. She expressed these
feelings to Mr. Desalvo her therapist,
and defendent Jacovb, because she
became concerned.

The defendents, Ryan and Shotz-
berger took her job because of the law
suit, and took her houseing and every-
think else to punish her, and to isolate
her. The plaintiff (before this took place)

-1-

Knew that something was wrong, but did not think that the defendent's were aware of her law-suit.

The defendents knew that it would not be wise to take everything from her without a reason, because they knew she would litigate, and most likely win her case.

Because the Plaintiff is being treated for depression with Wellbutrin, and Effexor, it gave them reason to play the mental illness card. They most likely thought that she would refuse to go to M.H.U., and then they would have an exuse to place her in isolation. The day DeSalvo and the Plaintiff met with defendent Shotzberger to discuss accusations the defendent was making she said "after all I havent sent you to the M.H.U." This was made in a joking manner. Plaintiff responded, "Good, because I wouldnt go." Then she - (Shotzberger) said, "I would never do that to you (1 week before she did). The Plaintiff was puzzled that the topic came up, but then forgot

about it.
         If that didn't happen, (isolation)
they will say that she was so stress-
ed out she had a nervous break down,
then they thought may be she would be-
come so devestated by their actions,
that she would break down, and would
not be capable or be too fearful to
fight back. If that happened they
could explain, "She's so mentally ill,
and we had to do this, after all she
has a history of mental illness and
she takes pychotropic drugs, and we
had to take her property because
we were concerned that she would
hurt herself, and of course we wont
allow her to do legal work, or have her
Books, or her job - we don't want her
to be placed under more stress. We
did all of these things to help and
protect her." These are conjectures,
but the plaintiff has been at BWCF.
for 9 years, and she knows their M.O.'s
         The plantiff can present to the
court extensive evidence, and bring

Supp -3-

forth numerous (100's) witnesses, from B.W.C.I administration, officers, Teachers and inmates to testify that there was nothing wrong with the plaintiff. In addition she can call Penny Chelluci, the president of the Mental Health Colition, who stays in contact with her, to testify that there was no evidence that the plaintiff was having problems.

Defendents Shotzberger and Ryan arranged an appointment with Dr. Jacovb to see the plaintiff. Dr. Jacovb attempted to make her angry. Regardless of what took place during that visit, Dr. Jacovb was going to recommend or suggest the M.H.U. It's difficult to imagine that jail officials are this evil. They have done similer acts against other inmates for "complaing" outside of B.W.C.I. This is a seriously dysfunctional prison.

The bottom line is, the defendents orchestrated this entire scenario to keep the plaintiff quiet. please don't believe their lies.

Terri Muser

2/13/06                          Plaintiff

Supp.-4-

in a small cell with a thief who stole the few
possesions the plaintiff had left.

2- Terminated Plaintiff from her job (that she has
held for the past 4 years) based on a false
accusation* Many of the inmates depended on
the plaintiff for help so it was not only the
plaintiff that was Effected, but the inmate population.

3- Confiscated all of the plaintiffs documents (legal)
from the Law Library including her legal and school
work on her hard drive, and a copy of the class
action suit she was drafting. The defendents
have refused to return any of these documents.

4. Confiscated most of the Plaintiffs property
including books she needed for school, and
new property that was sent to her and approved,
and books that were approved (list enclosed) and had
Great value to her.

5. Made threats that, if she does "not start doing
things differently" (meaning not complaining)
she may have great difficulty when she goes
to work Release, and her level 4 may be
violated.

6. Warden Ryan has barred the Plaintiff
from the Law Library indefinatly.

7. Warden Ryan destroyed Plaintiffs personal
property that she was permitted to have
and ___ he knew was important to her,
without due process or notice of deprivation
in a Cruel and Unusual manner.

8. Plaintiff has not ___ recieved mail
for the past 3 weeks, so it appears that
it's being confiscated. Likewise, the Plaintiff
highly suspects her mail is not going out.
her phone access is not functioning.

* That the defendents                - 20 -
made.

Plaintiff is aware that a few of these actions the defendents took standing alone may not violate the U.S. Constitution — Nonetheless these violations are Constitutional torts because of the damage they have done to the plaintiff, physically and mentally, and because the actions taken against her for practicing her 1st amendment rights are not legal and unconstitutional. See Pratt vs Rowland 65 F.3rd 802, 806-807 (9th Cir 1995) See also Rouse vs. Benson 193 F.3rd 936, 939 (8th Cir. 1999)

The plaintiff is in fear for her safety because of the extent the defendents have gone to, in order to prevent her from filing her lawsuit. It's frightening to imagine what they may do next. As mentioned earlier the severe stress of this situation is causing her numerous problems including difficulty eating, weight loss, insomnia, gastro intestical problems, headaches that are significantly worse than usual, and tremors. There's a good liklihood that the plaintiff, because she is already being treated for depression will develop a post traumatic stress disorder-which even with treatment can last a lifetime. P.T.S.D. and depression will significantly effect her physical and emotional health, and will alter her life profoundly. Research has shown that stress, over a long period of time can have a devestating effect on an individuals health and well-being.

It seems to the plaintiff that if she was mentally ill - like the defendents want others to believe, and needed care so badly that she was immediately rushed to the mental Health unit, it would be extremely difficul to sit down and draft this Lawsuit, without forms, cases, or any legal Books or material.) However, as the plaintiff stated earlier she is not mentally ill, or a disciplinary problem, She's in the Mental health unit so that the defendents can Control her, and keep her from exposing them from their Wrong-doings.

<u>Prayer for Relief</u>

Therefore, the plaintiff respectfully requests that this honorable Court protect her Constitutional rights by granting the following:

1. punitive damages (exemplary)
2. Nominal damages
3. injunctive relief
4. Compensatory for the awfulness of the defendents Conduct.

2-13-06
<u>Date</u>

Terri Lee Meyer
<u>Plaintiff</u>



UNITED STATES
POSTAL SERVICE

0000

FIRST CLASS

**To:** United States District Court
Caleb Boggs Federal Bldg.
844 N King Street
Wilmington, DE. 19801

U.S.M.S.
02/22/06

**From:** Terri Meyer
660 Baylor Blvd
New Castle,
Delaware 19720





UNITED STATES
POSTAL SERVICE

0000



**To:** United States District Court
Caleb Boggs Federal Bldg.
844 N. King Street
Wilmington, DE 19801

U.S.M.S.
K-BAY

**From:** Terri Meyer
6060 Baylor Blud
New Castle,
Delaware 19720



*These documents are submitted to show my recent state of mind*

**PUBLIC DEFENDER OF THE STATE OF DELAWARE**
ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

T. ANDREW ROSEN
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5128

November 18, 2005

06-117

Terri Meyer
SBI# 00371169
WCI
N-440
660 Baylor Blvd.
New Castle, DE  19720

Ms. Meyer,

    I did receive your message and was able to keep you from being transported down to Dover for nothing.

    I believe that you made a sound decision based on the information we had at our disposal.  I have never seen a successfully Pardon board hearing with both the prison and parole board submitting negative reports.  Fortunately, you don't have too much time remaining until your release date.  I would suggest that you continue to use that time to prepare yourself for succeeding upon your release.  Too often programming pursued for the purpose of getting out, and the goal of making sure you can stay out is missed.

    Good luck!

                                    Yours,

                                    T. Andrew Rosen, Esq.

# BEFORE THE BOARD OF PARDONS

# IN AND FOR THE STATE OF DELAWARE

## IN THE MATTER OF:TERRI LEE MEYER

### APPLICATION FOR COMMUTATION

**COMES NOW**, the petitioner,  Terri Meyer, and through her counsel, T. Andrew Rosen, respectfully requests that this Honorable Board recommend a Commutation pursuant to Article 7, Section 1 of the Delaware Constitution. By this Petition, Ms. Meyer  requests the Board of Pardons to recommend to  the Governor to grant her a Commutation of her sentence for  Murder 2nd degree and Possession of a deadly weapon during commission of a felony.

In support of this Petition and application, the petitioner represents to the Board and the Governor as follows:

1. This application does  involve a crime subject to Rule 9 of the Rules of the Board of Pardons, and therefore does  require a psychiatric and/or psychological procedure.

2. A certified copy of the Court records of the Superior Court showing the sentence  imposed is attached hereto as Exhibit A.  (See Attached Exhibit A)

PUBLIC DEFENDER OF THE STATE OF DELAWARE
ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

December 15, 2003

Stan Taylor
Commissioner of Corrections
245 McKee Road
Dover, DE  19904

Re: Notice of Petition to the Board of Pardons

Commissioner Taylor,

Please be advised that Terri Lee Meyer is presenting a petition to the Board of

Pardons for a Commutation of Sentence at the next available date and time.  The hearing

will be held in Courtroom 1 of Kent County Superior Court, 38 The Green in Dover,

Delaware.

Ms. Meyer was born on 6/27/56, and was convicted of Mrder 2nd degree and

Possession of a deadly weapon during commission of a felony.

Ms. Meyer is applying to the Board of Pardons because he has addressed the issues

that resulted in her conviction and incarceration, and is ready to return to society as a

productive member.

T. Andrew Rosen, Esq.
Office of the Public Defender
Carvel State Office Bldg.
820 N. French Street
P.O. Box 8911, Box C-500
Wilmington, DE  19801

*Terri Lee Meyer*

## REASONS FOR APPLYING FOR COMMUTATION

To guide me in my rehabilitation and to help me with the problems that led to my offense I have participated in a variety of programs. The program that helped me the most was the **Alternatives to Violence Program** where I worked on anger management and communication problems. I found that sometimes I have difficulty communicating with others because of the way I say things, or because of my body language. With the support of this program I have become better at thinking before speaking and being aware of how my body language might be interpreted by others. Although I learned numerous things in this program the most helpful skill I learned was how to use "I feel" statements to communicate with others when I need to express how I feel. In addition to this I was afforded the opportunity to learn skills in conflict resolution. I discovered that essentially every conflict has a peaceful resolution if I am willing to work at it rather than just react. In the past my reactions were automatic. They occurred in response to certain situations and things that happened that I thought were not my fault or responsibility. I thought it was always the fault of the situation, which caused me to blame everyone and everything around me for my problems. In AVP I was able to work on the root causes of my reactions and anger, and recognize what is in my control and what is not. I have come to realize that I am the main source of the problems in my life and the only one who makes the decision to be angry. I now see that I have a choice in how I am going to react.

*1*

I also attended the **Advanced Alternatives to Violence** program. In the Advanced Program I worked on assertiveness, expressing feelings, beliefs, and preferences in a way that is direct, honest, appropriate, and shows regard for my rights as well as the rights and feelings of others. Moreover, being respectful even when I do not get what I want, and being willing to negotiate. I worked on being considerate and in control and contending with difficulties with my feelings rather than letting them control me. I acquired skills in how to deal with other's anger by using non-threatening gestures, listening to the other person, showing empathy, trying to solve the problem, and realizing that it was my actions, not me as a person who caused the other person to get angry.

I participated in the **Delaware Mentor Program -- Pre Release Program** where I was able to look at boundary issues. Through role playing I learned that my boundaries with others were often blurred and enmeshed, and that I frequently crossed the boundaries of others. By acting out everyday situations with safe people I was able to practice "letting go" of others, to respect others' boundaries and to develop sound boundaries for myself. More important I was able to observe what is healthy and what is not healthy in a relationship, and how to recognize the signs of a dysfunctional relationship. PRC provided a variety of speakers and mentors from the community who talked about numerous life skill issues, but the topics that helped me the most were, domestic violence, codependency and how to cope with past abuse. I learned that I carry excessive emotional baggage from past abuses, and I am working toward unloading this baggage. I am making progress in this area by my willingness to work on myself and my problems by taking charge of my life, and

striving to becoming a dependable and honest person who is learning to understand and communicate with others.

.

I have participated in several mental health groups. The group that I acquired the most from was the **Self Awareness Group**. In addition to working on issues in a group I was able to spend time with the therapist one-on-one who helped me to be more open with my problems. The main advantage of group therapy was I learned how to take care of my emotional well-being by listening to my peers and their experiences with recovery. I discovered that I am not alone in my problems.  I found that developing a healthy relationship with myself will help me to avoid becoming emotionally involved or enmeshed in the problems of others. I am working on developing a better self-image and identity, and I am endeavoring toward improving my social behaviors and beliefs as well as setting realistic goals. Moreover, I am in the process of evaluating and organizing my life by journaling, taking personal inventory, and exploring transforming lifestyle choices. This has helped me to examine the issues that led to my incarceration so that I will not repeat the same mistakes.

In addition to the therapist I spent time in therapy with Dr. Kho. who worked with me on self-esteem issues and interpersonal problems. I was having difficulty with ultrasensitivity and tolerance with other's behaviors toward me. As peculiar as it might sound the most valuable lesson Dr. Kho taught me was "sticks and stones" Now when someone says something detrimental to me or about me I say to myself

"sticks and stones" and I am better able to let it go of the situation. In the past I was extra sensitive towards those around me, and had a difficult time accepting criticism Dr. Kho helped me to see that there will always be people around me who will say things that are critical or things that I disagree with. Learning to live with differences is vital to my emotional well being, and continued recovery.

Ms. Sharlene Hudson my counselor also helped me explore my anger and relationships with others. She helped me to see that I have a tendency to internalize things and that when I am angry with someone my way of "waging war" with that person is to withdraw and isolate myself from them. She showed me how this could be an unhealthy reaction to my anger. Foremost she helped me to see when it is healthy to retreat and set firm boundaries, and when it is appropriate to attempt to work out the problem. Resentment and holding in my feelings is a luxury I cannot afford if I want to continue in my recovery and live an emotionally accountable life.

I have remained free of substances for 7 years. I achieved this with the support of the groups, meditation, relaxation exercises, physical exercise, and working on developing a healthier self image. I have learned through my groups, my peers who have been successful with sobriety, and by studying my AA literature the consequences of my substance abuse, and how I have hurt others with my addiction. I work the 12 steps of AA and I have attempted (when possible) to make amends to the people in my life whom I have hurt. I realize that my recovery is something I must work on for the rest of my life if I am to remain clean and sober, and that it is the first drink or drug that will cause me to relapse. I have had to let go

*4*

of many of my old destructive ideas and learn how to enjoy life without being "high." Looking at my myself honestly made clear the powerlessness and unmanageability in my life, and I have had to look at new ways to cope with life different from my old ones. I recognize that I have to keep my sobriety independent of everything else in my life, and keep it first no matter what. It does not matter how good of a job I have, or how others treat me, or how my life is going in general. I have to keep my sobriety first and foremost. When I am released I plan to continue working the AA program by attending meetings, finding a sponsor, continuing to work the 12 steps and not using any addictive substances one day at a time.

I have completed other programs aside from the ones I mentioned including, **Life Skills, Anger Management, Drug Education and Intervention, Addiction Education**, **General Mental Health group, Inner Healing Seminar, Sexual Abuse group, Inside Out Program, HIV/AIDS Education,** and **Long Timer's group.** In addition, I have participated in a variety of **spiritual growth programs**. I received something from each and every one of these programs and took something positive with me from every program. The most valuable thing I learned from all of these programs was to respect myself, expect respect, and respect the rights of others.

Despite my rehabilitation, I do not take my offense lightly. I fully understand the seriousness and implications of taking the life of another human being. I am extremely remorseful about the pain the family has suffered. I know that I have tragically changed their lives forever. I cannot change what happened but if I could go back before the offense occurred, I would have found a way to leave the

*Terri Lee Meyer*

relationship long before it escalated to the extent it did. I have learned a very

distressing lesson unfortunately at the expense of the victim's life, and the expense

of her friends' and family's life.



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
**DELORES J. BAYLOR WOMEN'S CORRECTIONAL INSTITUTION**
**660 BAYLOR BOULEVARD**
**NEW CASTLE, DELAWARE 19720**

August 13, 2004

Board of Pardons
State of Delaware

On this occasion, I am writing to you regarding Inmate Terri Lee Meyer, SBI Number 00371169, currently incarcerated at this institution serving a twelve year Level V sentence for conviction of Murder 2nd Degree and Possession of a Deadly Weapons during the Commission of a Felony.

Since her selection as Law Library Clerk in May 2002, I have supervised Ms. Meyer on a daily basis. Her duties include assisting Inmates in a broad range of both criminal and civil law matters that include pretrial, trial and post-conviction litigation. Her performance in this capacity has been notable. She has learned a great deal and continues to expand her knowledge of the complexities of both the State and federal judicial systems. Her efforts are especially commendable in assisting inmates that suffer from learning disabilities.

Thank you for this opportunity to address the Board.

MacKinnon G. Young
Paralegal II
Law Librarian

## MEMORANDUM

TO:     WHOM IT MAY CONCERN
FROM:   GEORGE O'CONNOR
SUBJECT:   LAW LIBRARY DOCUMENTS
DATE:   10/20/2005

This is to certify that inmate Terri Meyer, SBI# 00371169, Unit 3; B-Pod is authorized to have Law Library materials in her possession while employed as the Law Library Clerk. Lists of those publications currently in her possession are contained in files of the Law Library. This is limited to (5) documents/publications at a time.

This authorization is good for six months from date of issue unless withdraw sooner.

George O'Connor

Law Library Paralegal

October 20, 2005

## BWCI MDT CLASSIFICATION

NAME: _Terri Meyer_   HOUSING UNIT: **3**   DATE: _11·3·05_   SBI: _37116F_

ON THE ABOVE DATE THE MDT CONSIDERED YOU FOR: ☐ INITIAL  ☑ REVIEW

### PROGRAMMING, EDUCATION, EMPLOYMENT:

☐ LIFE SKILLS  ☐ COMPUTER CLASS (WORD, EXCEL, POWERPOINT, TYPING)  ☑ ACADEMICS (GED/HIGH SCHOOL)  ☐ COLLEGE COURSES _correspondence course_

☐ ALCOHOLICS ANON (AA)  ☐ ALTERNATIVES TO VIOLENCE (AVP)  ☐ DACOA  ☐ DEIP  ☐ DEL MENTOR PROGRAM (PRC)

☐ THRESHOLDS  ☐ PARENTING  ☐ REACH  ☐ BIG BROTHERS/SISTERS  ☐ READ ALOUD  ☐ PARENTS ANON.  ☐ GIRL SCOUTS

☐ MENTAL HEALTH: ☐ Counseling  or  ☐ Groups (specify)_____  ☐ MISC. PROGRAMMING: _____

☐ KEY VILLAGE PROGRAM  ☐ ADMIN WORKER  ☐ KITCHEN  ☑ OTHER EMPLOYMENT (SPECIFY): _Law Library Clerk_

### HOUSING UNIT :

☐ UNIT 7 - Pre-Trial      ☐ UNIT 8– Maximum      ☐ UNIT 5 - Medium      ☐ UNIT 9 - Medium

☐ UNIT 6 –The Harbor :      ☐ KEY Village (Unit 4) :      ☐ UNIT 3 (A & D Pods) - Minimum
   ☐ Medium  ☐ Minimum         ☐ Medium  ☐ Minimum

☑ UNIT 3 (B Pod) - _Honor_ Pod (Minimum)  _cont_     ☐ UNIT 3 (C Pod) - _Honor_ Pod (Minimum)

### COMMUNITY CORRECTIONS:

☐ WORK RELEASE : ___ Plummer ___ Sussex ___ MCC      ☐ WORK RELEASE WITH CREST      ☐ IWA BUILDING WORKER
   ___ New Castle County Work Release Center

### OTHER:

☑ TIS SENTENCE MODIFICATION      ☐ PRE-PAROLE CONSIDERATION      ☐ PARDONS BOARD      ☐ BOOT CAMP

THE MDT DECISION IS TO:

☑ Approve     ___ Not Approve     ___ Recommend Approval     ☑ Not Recommend Approval  4 - 0  _TIS Mod_

___ Defer     ___ No Action     ___ No Objection (LV 4 or Detentioner)     ___ Objection (LV4 or Det.)

VOTE: _4 --- 0_

### REASON :

( ) Serious nature of your offense
( ) Your unsatisfactory/questionable institutional adjustment
( ) Your lack of program participation
( ) Your prior failure under supervision
( ) The lack of evidence that you have addressed your problems in a serious, mature manner.
( ) The time remaining on your sentence
( ) You are not eligible due to policy/statue
(✓) This does not meet your program needs at this time
( ) Your need for gradual phasing
( ) You are already employed in one institution job.
( ) Other _____

REMARKS: _acad apprentice - computers_

_____      _____
        MDT CHAIRPERSON                    WARDEN/IBCC CHAIRPERSON
Cc: Records
    Resident

## BWCI MDT CLASSIFICATION

NAME: _Terri Meyer_   HOUSING UNIT: U6   DATE: 01/27/06   SBI: 371169

ON THE ABOVE DATE THE MDT CONSIDERED YOU FOR:  ☐ INITIAL   ☐ REVIEW

### PROGRAMMING, EDUCATION, EMPLOYMENT:

☐ LIFE SKILLS  ☐ COMPUTER CLASS (WORD, EXCEL, POWERPOINT, TYPING)  ☐ ACADEMICS (GED/HIGH SCHOOL)  ☐ COLLEGE COURSES

☐ ALCOHOLICS ANON (AA)   ☐ ALTERNATIVES TO VIOLENCE (AVP)  ☐ DACOA   ☐ DEIP   ☐ DEL MENTOR PROGRAM (PRC)

☐ THRESHOLDS  ☐ PARENTING  ☐ REACH  ☐ BIG BROTHERS/SISTERS  ☐ READ ALOUD   ☐ PARENTS ANON.  ☐ GIRL SCOUTS

☐ MENTAL HEALTH: ☐ Counseling  or  ☐ Groups (specify)_____  ☐ MISC. PROGRAMMING: _Rescind_

☐ KEY VILLAGE PROGRAM   ☐ ADMIN WORKER  ☐ KITCHEN  ☒ OTHER EMPLOYMENT (SPECIFY): _Law Library (Para Ele.)_

### HOUSING UNIT :

☐ UNIT 7 - Pre-Trial   ☐ UNIT 8 – Maximum   ☐ UNIT 5 - Medium   ☐ UNIT 9 - Medium

☒ UNIT 6 –The Harbor :       ☐ KEY Village (Unit 4) :       ☐ UNIT 3 (A & D Pods) - Minimum
   ☒ Medium ☐ Minimum        ☐ Medium ☐ Minimum

☐ UNIT 3 (B Pod) - *Honor* Pod  (Minimum)       ☐ UNIT 3 (C Pod) - *Honor* Pod (Minimum)

### COMMUNITY CORRECTIONS:

☐ WORK RELEASE :  ___ Plummer  ___Sussex  ___MCC       ☐ WORK RELEASE WITH CREST       ☐ IWA BUILDING WORKER
                      ___ New Castle County Work Release Center

### OTHER:

☐ TIS SENTENCE MODIFICATION       ☐ PRE-PAROLE CONSIDERATION       ☐ PARDONS BOARD       ☐ BOOT CAMP

---

**THE MDT DECISION IS TO:**

☒ Approve   ____ Not Approve   ____ Recommend Approval   ____ Not Recommend Approval

____ Defer   ____ No Action   ____ No Objection (LV 4 or Detentioner)   ____ Objection (LV4 or Det.)

VOTE: _3_ -- _0_

---

**REASON :**
( ) Serious nature of your offense
( ) Your unsatisfactory/questionable institutional adjustment
( ) Your lack of program participation
( ) Your prior failure under supervision
( ) The lack of evidence that you have addressed your problems in a serious, mature manner.
( ) The time remaining on your sentence
( ) You are not eligible due to policy/statue
( ) This does not meet your program needs at this time
( ) Your need for gradual phasing
( ) You are already employed in one institution job.
( ) Other _____    _To be reviewed_

✱ Filled out a day a day AFTER I was Moved

REMARKS: _Unit 6 Administrative Transfer_

_Callen T. _____     _____ Patrick J. Ryan_
Cc: Records              **MDT CHAIRPERSON**              **WARDEN/IBCC CHAIRPERSON**
    Resident
                              - Rescind Law Library
                              - Approved Unit 6